CAMPING CONSTRUCTION COMPA-
NY, Plaintiff–Appellee,

v.

DISTRICT COUNCIL OF IRON WORK-
ERS; Iron Workers Local Union 378,
Defendants–Appellants.

CAMPING CONSTRUCTION COMPA-
NY, Plaintiff–Appellee–
Cross–Appellant,

v.

DISTRICT COUNCIL OF IRON WORK-
ERS OF the STATE OF CALIFORNIA
AND VICINITY, an unincorporated as-
sociation, and Iron Workers Local Un-
ion No. 378, an unincorporated associa-
tion, Defendants–Appellants–Cross–Ap-
pellees.

Nos. 87–2767, 88–15169.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 16, 1989.

Decided Oct. 2, 1990.

Mark R. Thierman and Robert Fried, Thierman, Cook, Brown & Prager, San Francisco, Cal., for plaintiff-appellee-cross-appellant.

Victor J. Van Bourg and Sandra Rae Benson, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for defendants-appellants-cross-appellees.

Before GOODWIN, Chief Judge, and PREGERSON and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

These consolidated appeals require us to address once again—for the last time, in all likelihood—the arbitrability of a labor dispute under a "prehire" collective-bargaining agreement when one of the parties claims to have repudiated that agreement. We must also decide the extent to which the Norris–LaGuardia Act, 47 Stat. 70, 29 U.S.C. §§ 101–115, constrains a district court's power to stay a labor arbitration while the issue of arbitrability is properly before that court. The court below granted the employer's request for a preliminary injunction staying the arbitration sought by the unions, in spite of the unions' claim that such an injunction was prohibited by the Norris–LaGuardia Act. However, the court later granted summary judgment for the unions on the ground that, under the broad arbitration clause at issue, questions relating to termination and repudiation of the agreement were to be decided by an arbitrator rather than the court; it then stayed the arbitration pending our decision. We conclude that the district court's order granting the preliminary injunction was in error, and that the order granting summary judgment for the unions was only partially correct. We therefore affirm in part, reverse in part, and remand for further proceedings.

I

STATEMENT OF THE CASE

Camping Construction Company ("Camping") is a California corporation engaged in

the business of constructing mini-storage facilities. The District Council of Iron Workers of the State of California and Vicinity (the "District Council") is a voluntary, unincorporated association comprising affiliated local labor unions, including Iron Workers Local Union 378 ("Local 378"). Both the District Council and Local 378 are "labor organization[s]" as that term is defined by the Labor Management Relations Act, 29 U.S.C. § 152(5).

On October 1, 1978, Camping and the District Council entered into a "prehire" collective-bargaining agreement[1] known as the Iron Workers Independent Agreement. In signing this agreement, Camping agreed to abide by the terms and conditions of employment set forth in the District Council's 1977–1980 Master Agreement, and "to comply with ... any amendments, modifications, changes, extensions or renewals of or to said Master Agreement which may be negotiated by the parties thereto." Camping employed union laborers in compliance with the agreements for a short time; however, this practice ceased sometime in 1979, and on February 1, 1980, the administrator of the California Field Iron Workers Trust Funds notified Camping that it was being placed on the "inactive list" because it had not reported the employment of any Iron Workers for the preceding six months.

On February 21, 1980, the District Council informed Camping by mail of its "desire to open the collective bargaining agreement of July 1, 1980 to negotiate changes, modifications, extensions and renewals." The contractor did not respond to the District Council's notice, and it is undisputed that after receiving this notice Camping never engaged in any collective bargaining or executed any further agreements. However, neither did Camping take any formal action to repudiate the agreement or to prevent its automatic renewal.

Since at least June 30, 1980, Camping has subcontracted out all iron workers'

work to nonunion companies at various projects throughout northern California. The contractor contends without dispute that since that time it has not used the union hiring hall, submitted fringe benefit contributions, or in any fashion operated under the terms of the agreements. Camping further asserts that its noncompliance with the agreements was well known in the industry, and that several unions (we are not told whether they included the defendants) regarded Camping as a nonunion contractor and picketed some of its projects on that basis. The unions assert, however, that the District Council, through the administrator of the California Field Iron Workers Administrative Trust (the "Administrator"), sent Camping no fewer than eleven notices of changes, amendments, and modifications between July 23, 1980, and June 5, 1987, all of which strongly suggest that the unions involved in this litigation believed Camping was still bound by the Master Agreement.

On February 27, 1987, Local 378 filed a grievance against Camping according to the grievance procedures set forth in the 1986–1989 Master Agreement, which the unions characterize as "an amendment, modification, change and renewal of the previous Master Agreements negotiated between the District Council of Iron Workers and the Employers Association." Section 28 of that agreement provides for the settlement of all grievances, other than jurisdictional disputes, by Boards of Adjustment which "shall have the power to adjust any differences that may arise regarding the meaning and enforcement of this Agreement." Local 378 claimed that Camping, by performing one of its jobs with nonunion labor, was violating two sections of the Master Agreement: section 20–B (governing the hiring of subcontractors) and section 5 (governing the use of the union hiring hall). The Administrator sent a copy of the grievance to Camping on

---

**1.** A "prehire" agreement is one negotiated by an employer and a union before the employer actually needs any laborers. Congress has specifically approved the use of such agreements in the construction industry due to its special characteristics. 29 U.S.C. § 158(f). *See generally*

*Jim McNeff, Inc. v. Todd,* 461 U.S. 260, 265–67, 103 S.Ct. 1753, 1756–57, 75 L.Ed.2d 830 (1983); *Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers,* 861 F.2d 1124, 1127–28 (9th Cir.1988) (*en banc*) ("*Mesa Verde II*").

March 9, along with a letter asking Camping to contact the administrator's office to schedule a meeting at which the grievance might be heard. Camping made no immediate response to this letter. On May 13, Camping received notice that a Board of Adjustment would be appointed to hear the grievance June 4. On May 26, Camping responded by requesting a postponement, and the Board notified Camping on June 2 that this request would be considered at the June 4 hearing.

Camping's counsel made a "special appearance" on June 4 in order to argue to the Board of Adjustment that it lacked jurisdiction over Camping because Camping was no longer bound to comply with the Master Agreement. In a letter of the same date, Camping's counsel explained to the Administrator that Camping regarded the District Council's letter of February 21, 1980, as a notice of termination pursuant to section 34 of the Agreement. The Board granted Camping's request for a postponement of the hearing.

On June 18, Local 378 filed another grievance against Camping, this time alleging hiring hall violations with respect to a different construction site. Notice of this second grievance was sent to Camping on June 23, again with a request that Camping contact the Administrator to schedule a grievance proceeding. Camping then filed with the district court a complaint for an injunction staying arbitration and for a declaration that Camping was no longer obligated to comply with the Master Agreement because (a) the District Council's letter of February 21, 1980, constituted a termination notice; and (b) Camping's subsequent conduct had served to repudiate the earlier agreement.

Two months later, Camping's motion for a preliminary injunction staying the arbitration came on before the Hon. Charles A. Legge, sitting in the absence of the Hon. Samuel Conti. Judge Legge noted that where the existence of an agreement to arbitrate is in dispute, that question is properly decided by a court prior to arbitration. He then concluded that Camping had shown a sufficient probability that it would succeed in showing that no such agreement existed. He further concluded that Camping might suffer irreparable harm if the arbitration went forward, for which it might lack an adequate remedy at law; and that the balance of hardships favored the granting of the requested relief. Accordingly, the court granted the preliminary injunction. The union appealed pursuant to 28 U.S.C. § 1292(a)(1).

The parties then filed cross-motions for summary judgment. Camping contended that the agreement had either been terminated by the District Council or repudiated by Camping's conduct; the unions argued that the questions of termination or repudiation, as well as the underlying disputes, were for the arbitration Board rather than the court to decide. On April 22, 1988, Judge Conti granted summary judgment for the unions, holding that both termination under the agreement and repudiation by conduct were arbitrable issues which the court could review only upon a motion to confirm or vacate the arbitration award. Camping's motion for reconsideration was denied on July 18, almost exactly one year after it filed its complaint. However, Judge Conti granted Camping's motion for a stay of its order pending appeal. Noting that the preliminary injunction was on appeal to this court, Judge Conti stated that he would "follow Judge Legge's determination and stay arbitration in this matter pending appeal." Camping timely filed its notice of appeal.

## II

## TERMINATION AND REPUDIATION

The Supreme Court recently reaffirmed as a "first principle" of federal labor law over the last thirty years the rule that " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960), and *Steelworkers v. American*

*Mfg. Co.*, 363 U.S. 564, 570–71, 80 S.Ct. 1343, 1347, 4 L.Ed.2d 1403 (1960)). The Court continued:

> The second rule, which follows inexorably from the first, is that the question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate a particular grievance—is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.

*AT & T Technologies*, 475 U.S. at 649, 106 S.Ct. at 1418.

However, the *AT & T Technologies* Court also recognized other principles of labor law that are no less compelling. One of these

> is that, in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator.

475 U.S. at 649–50, 106 S.Ct. at 1419. Moreover, the *AT & T Technologies* Court also regarded it as

> established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless

it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

475 U.S. at 650, 106 S.Ct. at 1419 (quoting *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. at 1353). Consideration of these four principles led the *AT & T Technologies* Court to conclude that an agreement to arbitrate "differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder" did not give an arbitrator the jurisdiction to determine arbitrability itself. 475 U.S. at 651–52, 106 S.Ct. at 1419.

■ The case before us presents a different question from the one before the Court in *AT & T Technologies*. There, the issue was whether, under the specific terms of a collective-bargaining agreement, a particular grievance was arbitrable. Instead of deciding the jurisdictional issue—and determining as they could have that the grievance was arbitrable—the district court and the court of appeals held that it was up to the arbitrator to determine the question of arbitrability. Here, neither party denies that the underlying grievances filed by Local 378 fall squarely within the jurisdiction granted to the arbitration board under the terms of the prehire agreement. However, the parties disagree strongly over whether, prior to the filing of the grievances, the collective-bargaining agreement containing the arbitration clause had been (1) terminated under the provisions of the contract's termination clause; or (2) repudiated as a result of some action or conduct on Camping's part[2]

---

**2.** Under the law applicable to this appeal, an employer could extinguish its obligations under a prehire collective-bargaining agreement not only by complying with the termination provisions (if any) of the agreement itself, but also by unilaterally "repudiating" the agreement. Because of our disposition of this case, we need not discuss the various ways in which repudiation could be accomplished. We note here, however, that following the National Labor Relations Board's interpretation of the relevant statutes, an *en banc* court has abolished the unilateral repudiation doctrine in this circuit. *Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers*, 861 F.2d 1124, 1126 (9th

Cir.1988) (*en banc*) ("*Mesa Verde II*") (following *Deklewa v. International Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 3*, 282 N.L.R.B. No. 184, 1986–87 NLRB Dec. (CCH) ¶ 18,549 (Feb. 20, 1987), *enforced sub nom. International Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 3 v. NLRB*, 843 F.2d 770 (3d Cir.1988)). The *Mesa Verde II en banc* court remanded to the original panel to determine whether the NLRB's *Deklewa* decision should be applied retroactively. *Mesa Verde II*, 861 F.2d at 1126. That panel held that the *Deklewa* rule would not be applied to employers who repudiated prior to February 20, 1987, the date of the *Deklewa* decision. *Mesa*

—and whether those two questions are themselves subject to arbitration. Unlike the lower courts in *AT & T Technologies,* the district court here did not say that the question of arbitrability was for the arbitrator rather than the court. Instead, as was proper, the court itself ruled on the arbitrability question, and concluded that both the termination issue and the repudiation issue were arbitrable.

In *Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 v. Interstate Distributor Co.,* we set forth the general rule applicable in cases presenting questions relating to disputes over termination or repudiation of collective-bargaining agreements: "[W]hen the collective bargaining agreement contains a customary arbitration clause acts of repudiation and other acts of termination must be submitted to arbitration." 832 F.2d 507, 511 n. 4 (9th Cir.1987). That rule applies whether the dispute between the parties is solely over termination or repudiation, or whether, as here, their disagreement over that question is a threshold issue that must be resolved before the underlying dispute can be reached. Thus, in the ordinary case, the district court's determination that both the issues of termination and repudiation were arbitrable would have been correct. However, in *Interstate Distributor* we also recognized that there is a narrow exception to the general rule under pre-*Deklewa*[3] law: when a *prehire contract* is involved, an employer's claim that it has effectively *repudiated* the contract containing the agreement to arbitrate is not arbitrable; that question must be decided by a court rather than an arbitrator. *Id.* (citing *Mesa Verde Constr. Co. v. Northern Cal. Dist.*

*Council of Laborers,* 820 F.2d 1006, 1009 (9th Cir.1987) (*"Mesa Verde I"*); *Ion Constr. Co. v. District Council of Painters No. 16,* 803 F.2d 1050, 1051 (9th Cir. 1986)). Our pre-*Deklewa* exception was based on the fact that the right to repudiate a prehire contract unilaterally was not a right created by the collective-bargaining agreement itself or by general principles of contract law, but rather by a federal statute. *Interstate Distributor,* 832 F.2d at 511 n. 4.

■ As *Interstate Distributor* makes clear, the pre-*Deklewa* prehire contract exception is limited to questions of repudiation and does not apply to questions of termination. When a collective-bargaining agreement contains the usual broad arbitration clause, a dispute over contract termination is arbitrable, regardless of whether a prehire contract is involved. The court's role in such cases is a fairly simple one. It must examine the arbitration clause and determine whether it is of the type referred to in *Interstate Distributor.* If so, the dispute is arbitrable, and the arbitrator rather than the court must examine the facts, construe the termination provision of the contract, and decide whether the contract has in fact been terminated. Usually, labor arbitration clauses are broad enough to cover disputes over termination. *E.g., Interstate Distributor,* 832 F.2d at 511; *George Day Constr. Co., Inc. v. United Bhd. of Carpenters & Joiners, Local 354,* 722 F.2d 1471 (9th Cir.1984). An agreement to arbitrate "any grievance or controversy affecting the mutual relations of the [parties]," *see Interstate Distributor,* 832 F.2d at 510 n. 2, or, as here, an agreement to arbitrate "any differences

Verde Constr. Co. v. Northern Dist. Council of Laborers, 895 F.2d 516, 520 (9th Cir.1990) ("Mesa Verde III"), cert. denied, —— U.S. ——, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990). Thus, pre-Deklewa law determines whether Camping successfully repudiated its prehire agreement prior to February 20, 1987. We note in passing that in its June 4, 1987, letter to the Administrator setting forth its jurisdictional objections to arbitration Camping relied exclusively on its termination argument and made no claim that the agreement had been repudiated, either expressly or as a result of any conduct on the part

of either party. We also note that while we are no longer the only circuit refusing to apply *Deklewa* retrospectively, *see United Bhd. of Carpenters and Joiners Local Union 953 v. Mar–Len of Louisiana, Inc.,* 906 F.2d 200 (5th Cir.1990), we were the first circuit to do so and are still in the minority. *See NLRB v. Bufco Corp.,* 899 F.2d 608 (7th Cir.1990); *NLRB v. W.L. Miller Co.,* 871 F.2d 745 (8th Cir.1989); *International Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 3 v. NLRB,* 843 F.2d 770 (3d Cir.1988).

**3.** See note 2 *supra.*

that may arise regarding the meaning and enforcement of this Agreement," or any other broad arbitration clause, such as "any dispute arising out of this Agreement," ordinarily requires us to hold that the parties have provided for arbitration of disputes regarding termination—and repudiation as well, except where the pre-*Deklewa* exception for prehire contracts applies.[4]

█ These observations make it clear that the district court was correct in ruling that whether the District Council's letter served to *terminate* the contract was a question for a board of adjustment to determine. The dispute over termination is, as the district court held, arbitrable under the agreement at issue here. However, the district court erred in ruling that the effectiveness of Camping's purported *repudiation* of the prehire agreement should also be submitted to arbitration. Because (1) repudiation rather than termination was at issue; (2) the contract was a prehire agreement rather than a regular collective-bargaining agreement; *and* (3) at least some of the alleged acts of repudiation occurred before February 20, 1987, when pre-*Deklewa* law applied;[5] the question of repudiation was for the court rather than the arbitrator to resolve. In granting a total summary judgment for the unions on the arbitrability issue, the district court failed to recognize the "narrow exception" for repudiation of prehire contracts, carved out in *Ion Construction* and clearly acknowledged in *Interstate Distributor*.

The district court was aware of, and correctly interpreted, our decision in *Ion Construction* establishing the prehire repudiation exception, as well as the original panel opinion in *Mesa Verde I*, 820 F.2d 1006, 1009–13 (9th Cir.1987). However, it apparently believed that after *Interstate Distributor* these "[p]rior inconsistent decisions ... do not control." It is, of course, true that our earlier decisions on repudiation of prehire contracts will soon hold only historical interest; the district court's conclusion that *Ion Construction* and *Mesa Verde I* have been superseded will become law once we have decided all of the cases to which pre-*Deklewa* rules are applicable. However, this will be a result of the National Labor Relations Board's decision in *Deklewa* and ours in *Mesa Verde II*, not our decision in *Interstate Distributor*. To the contrary, in *Interstate Distributor* we were obligated to recognize the continued validity of *Ion Construction* and the now-superseded opinion in *Mesa Verde I*, and we did so explicitly; however, we also explained explicitly that those cases applied only to claims of repudiation of prehire agreements. 832 F.2d at 511 n. 4. Thus, pre-*Deklewa* law in this circuit included both the rule of *Interstate Distributor* and the *Ion Construction* exception, not merely one or the other. Post-*Deklewa* law is, fortunately, far simpler. Only the *Interstate Distributor* rule will apply, and the *Ion Construction* exception will shortly die a well-deserved natural death. For now, however, and on remand in particular, courts in our circuit must continue to apply pre-*Deklewa* law to any alleged acts of repudiation that occurred before February 20, 1987.

Much of the confusion over issues like the ones before us today is attributable to the fact that the deceptively simple dichoto-

---

**4.** *LAWI/CSA Consolidators, Inc. v. Wholesale & Retail Food Distribution, Teamsters Local 63,* 849 F.2d 1236 (9th Cir.1988), is not to the contrary. The *LAWI/CSA* court properly acknowledged the rule of *Interstate Distributor,* but distinguished that case on the ground that the arbitration clause in *LAWI/CSA* was different from the one involved in *Interstate Distributor. Id.* at 1239. In its opinion, the *LAWI/CSA* court did not quote the applicable arbitration clause, but in light of our statement in *Interstate Distributor* that under a *"customary* arbitration clause acts of repudiation and other acts of

termination must be submitted to arbitration," 832 F.2d at 511 n. 4 (emphasis added), we must presume that the parties in *LAWI/CSA* had adopted a narrower and more limited arbitration clause than is customarily incorporated in collective-bargaining agreements.

**5.** Under *Mesa Verde III,* alleged acts of repudiation after February 20, 1987, could not serve as a basis for a finding (by either the court or an arbitration board) that the contract had been repudiated, because *Deklewa* precludes unilateral repudiation after that date. *Mesa Verde III,* 895 F.2d at 520.

my set forth in *AT & T Technologies*—between "arbitrability" and "the merits"—is ill-suited to cases like the instant one. Where an employer raises an issue of termination or repudiation in defense to an otherwise plainly arbitrable grievance, the issue can be framed in two very different ways, as we observed in *Interstate Distributor*, 832 F.2d at 511. In this case, for instance, we say that the district court was called upon to determine the arbitrability of the termination and repudiation issues themselves; we then say that the court was correct in exercising jurisdiction over the question of arbitrability, and that it was correct in deciding that the issue of termination was arbitrable, but that it was incorrect when it reached that same result with respect to the repudiation issue. This, as we said in *Interstate Distributor*, is the preferred analytical approach.

Alternatively, we could have said that the question before the district court was the arbitrability of the underlying grievances—which were over hiring and subcontracting and were thus clearly arbitrable if the contract was still in effect—and that by referring "the merits" of the issues of repudiation and termination to the arbitrator, the court held that the question of "arbitrability" (of the underlying grievances) was itself arbitrable. As we pointed out in *Interstate Distributor*, such an analysis is possible because the parties are free to agree to arbitrate issues of arbitrability. Were we to apply that analytical approach here, we would conclude that the district court was correct in holding that, under the contract, disputes over termination are themselves arbitrable, and in that sense the issue of the arbitrability of the underlying grievances *is* for the arbitrator. At the same time, viewing the collective-bargaining agreement in light of pre-*Deklewa* law, we would have to conclude that the parties did *not* agree to submit controversies over repudiation to the arbitrator; therefore, to the extent that "arbitrability" of the underlying grievances is governed by "the merits" of the repudiation issue, arbitrability must be decided by the court. Thus, here,

as in *Interstate Distributor*, the outcome is the same whichever approach we adopt.

It is worth noting that similar issues do not generally arise when the question is whether the parties actually entered into a collective-bargaining agreement. In cases presenting that issue, one of the parties is usually arguing that there is no arbitration agreement at all, because the contract containing the arbitration clause was never fully agreed to. In such cases, the basic *AT & T Technologies* rule applies. The court must determine whether a contract *ever* existed; unless that issue is decided in favor of the party seeking arbitration, there is no basis for submitting any question to an arbitrator. As we have noted, however, once it is found that a contract did exist at some time, the questions of whether that contract has expired, or has been terminated or repudiated, may well present arbitrable issues, depending on the language of the agreed-upon arbitration clause.

Thus, we affirm the district court insofar as it held that an arbitration board must decide whether, as Camping claims, the District Council's letter of February 21, 1980, effected a valid termination of Camping's contractual obligations under the 1977–1980 Master Agreement. However, we must reverse the district court's determination that the issue of repudiation was also arbitrable. The question of repudiation, at least with respect to any conduct allegedly occurring before February 20, 1987, was for the district court to determine. Since Judge Conti believed the court lacked jurisdiction over that question, he did not reach the merits of the repudiation issue. Therefore, we must remand the repudiation question to the district court for its determination on the merits.

## III

### THE NORRIS–LaGUARDIA ACT

■ Having disposed of Camping's appeal of the order of summary judgment, we turn to the unions' interlocutory appeal of the district court's order staying arbitration proceedings pending its resolution of the arbitrability issue. The unions argue

here, as they did in the district court, that such an order is subject to the limitations imposed by the Norris–LaGuardia Act, 47 Stat. 70–73, 29 U.S.C. §§ 101–115. By that act Congress severely restricted the jurisdiction of the federal courts to issue injunctions in "any labor dispute." Section 1 provides,

> No court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101.[6] The "provisions of this chapter" to which section 1 refers include section 4 of the Act, which sets forth a list of specific acts against which the federal courts may under no circumstances issue an injunction.[7] In addition, sections 7 and 9 of the Act impose a number of substantive and procedural conditions on the availability of injunctive relief in all other cases involving or growing out of a labor dispute,[8] and section 8 prohibits an award of

---

**6.** The "public policy declared in this chapter" is set forth in section 2 of the Act, 29 U.S.C. § 102.

**7.** Section 4 provides,

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
>
> (a) Ceasing or refusing to perform any work or to remain in any relation of employment;
>
> (b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;
>
> (c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;
>
> (d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;
>
> (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
>
> (f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;
>
> (g) Advising or notifying any person of an intention to do any of the acts heretofore specified;
>
> (h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and
>
> (i) Advising, urging, or ·otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.
>
> 29 U.S.C. § 104. The unions do not contend that the district court's order violated section 4.

**8.** Section 7 provides, in pertinent part,

> No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect—
>
> (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained . . . ;
>
> (b) That substantial and irreparable injury to complainant's property will follow;
>
> (c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;
>
> (d) That complainant has no adequate remedy at law; and
>
> (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.
>
> Such hearing shall be held after due and personal notice thereof has been given, in such manner as the court shall direct, to all known persons against whom relief is sought, and also to the chief of those public officials of the county and city within which the unlawful acts have been threatened or committed charged with the duty to protect complainant's property. . . . [Temporary restraining orders may be granted when somewhat less exacting requirements are met, but they may not remain in effect longer than five days.] No temporary restraining order or temporary

injunctive relief to "any complainant ... who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108. According to the unions, the district court's failure to abide by the conditions of the Act requires us to vacate the district court's injunction.

We note that the same contention was pressed in *Mesa Verde*, but the original panel opinion in that case rejected the argument as moot. *Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers*, 820 F.2d 1006, 1009 (*Mesa Verde I*), reh'g granted en banc, 832 F.2d 1164 (9th Cir. 1987), remanded, 861 F.2d 1124 (9th Cir. 1988). In this case, however, it is not. Here, there will be arbitrable issues remaining after our decision, including not only the termination issue but the merits of the two grievances as well. There will also be an issue of repudiation for the district court to decide. Thus, the district court will again be faced with the decision whether to stay the arbitration—this time, while it decides whether Camping has repudiated the contract. Under these circumstances, the case has not "lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969) (*per curiam*), quoted in *Lindquist v. Idaho State Bd. of Corrections*, 776 F.2d 851, 853–54 (9th Cir. 1985); see also *United States v. Oregon*, 657 F.2d 1009, 1012 n. 7 (9th Cir.1981) (*per* Kennedy, J.) (appeal of expired preliminary

injunction is not moot where "issues raised ... are of an enduring nature," they "go to the very core of the court's power to hear this controversy," and they are likely to recur in the case). Moreover, in this case, following its grant of summary judgment, the district court noted that the preliminary injunction had been appealed to this court and on that basis decided to "follow Judge Legge's determination and stay arbitration in this matter pending appeal." Thus, the district court's exercise of its injunctive powers without regard for the provisions of the Norris–LaGuardia Act presents a very live controversy in the most traditional sense.

**A**

■ We take as our starting point the language of the Norris–LaGuardia Act itself, which presents a formidable obstacle to Camping's claim that the district court was not required to comply with that statute. The Act by its terms applies to any "case involving or growing out of a labor dispute," 29 U.S.C. §§ 101, 107, 109; *cf.* §§ 104, 108. Section 13 defines the phrase "labor dispute" to "include[ ] any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c). This definition is extraordinarily broad, and the Supreme Court has so interpreted it. *Jacksonville Bulk Terminals,*

---

injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.
29 U.S.C. § 107.

Section 9 specifies additional procedural safeguards, as well as a limitation on the substantive scope of any injunction ultimately issued:

No restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute, except on the basis of findings of fact made and filed by the court in the record of the case prior to the issuance of such restraining order or injunction; and every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and as shall be expressly included in said findings of fact made and filed by the court as provided in this chapter.
29 U.S.C. § 109.

*Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 712–14, 102 S.Ct. 2672, 2680–81, 73 L.Ed.2d 327 (1982) (quoting *Columbia River Packers Ass'n, Inc. v. Hinton*, 315 U.S. 143, 147, 62 S.Ct. 520, 522, 86 L.Ed. 750 (1942)) (a union's work stoppage, although motivated exclusively by geopolitical concerns, is a labor dispute because "the employer-employee relationship [is] the matrix of the controversy"); *New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552, 559–61, 58 S.Ct. 703, 707, 82 L.Ed. 1012 (1938) (finding that picketers who were neither employees nor union organizers, and who were asserting political and social interests rather than economic interests commonly associated with labor unions, were persons interested in a labor dispute within the meaning of section 13). The language of the Act, and the cases interpreting it, leave us with absolutely no doubt that Camping and the unions are engaged in a labor dispute within the literal terms of the Act.

Nor can it be argued that the type of injunctive relief granted below is not covered by the literal provisions of the Act. Although we have never addressed this precise question before, we have clearly held that an order staying arbitration is a "classic form of injunction," not "a mere step in the controlling of litigation before the court." *A. & E. Plastik Pak Co., Inc. v. Monsanto Co.*, 396 F.2d 710, 713 (9th Cir.1968) (order denying stay of nonlabor arbitration is an order denying a temporary injunction, and may therefore be the subject of an interlocutory appeal under 28 U.S.C. § 1292(a)(1)). Although *A. & E. Plastik Pak* was not a labor case, we can think of no reason why an order staying a labor case is any less an injunction. *Accord In re District No. 1—Pacific Coast Dist., Marine Eng'rs' Beneficial Ass'n*, 723 F.2d 70 (D.C.Cir.1983); *Jou–Jou Designs, Inc. v. International Ladies Garment Workers Union*, 643 F.2d 905 (2d Cir.1981). Thus we have before us a preliminary injunction issued by a federal court in a labor dispute, and there can be little doubt that under a literal reading of Norris–LaGuardia, the Act applies to the

district court's stay of the arbitration proceedings.

**B**

With many statutes our inquiry would end with the discovery of a literal meaning so plain. However, the Supreme Court has made it clear that the Norris–LaGuardia Act is not necessarily to be construed literally in all circumstances. Enacted in 1932, the Norris–LaGuardia Act is one of the oldest surviving pieces of labor legislation in this country. More recent acts providing for more extensive regulation of labor-management relations (such as the Wagner Act, the Taft–Hartley Act, and Title VII of the Civil Rights Act of 1964) have changed the face of labor law in the United States, yet there has been no accompanying revision of the Norris–LaGuardia Act. The courts have thus been left with the task of attempting to accommodate Norris–LaGuardia to later acts in order to create a coherent whole. *See generally Boys Markets, Inc. v. Retail Clerk's Union, Local 770*, 398 U.S. 235, 242–53, 90 S.Ct. 1583, 1584–88, 26 L.Ed.2d 199 (1970). The result has been that, in spite of what the Norris–LaGuardia Act says, the Supreme Court has held that federal courts *do* have jurisdiction to issue injunctions in *some* labor disputes, even in some of the circumstances covered by section 4's outright ban. For example, it has long been settled that federal courts have jurisdiction, in spite of the Norris–LaGuardia Act, to compel a recalcitrant ·employer to honor its agreement to arbitrate. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 457–59, 77 S.Ct. 912, 918–19, 1 L.Ed.2d 972 (1957). Moreover, when a union refuses to honor its contractual commitment to arbitrate and instead calls a strike, a federal court may grant a prohibitory injunction against the strike, *Boys Markets*, 398 U.S. at 253–54, 90 S.Ct. at 1594, as long as the dispute underlying the strike is arbitrable, *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 407–12, 96 S.Ct. 3141, 3147–50, 49 L.Ed.2d 1022 (1976); *see also Jacksonville Bulk Terminals*, 457 U.S. at 708–09, 102 S.Ct. at 2678. And among the earliest of these accommodation cases were cases in

which the Court held that Norris–LaGuardia does not prevent courts from issuing injunctions to enforce positive duties imposed by other federal labor statutes. *See, e.g., Brotherhood of R.R. Trainmen v. Chicago River & Ind. Ry.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957) (union's statutory duty to arbitrate "minor disputes" under the Railway Labor Act); *Brotherhood of R.R. Trainmen v. Howard*, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952) (union's duty under RLA not to discriminate against non-union black train porters); *Graham v. Brotherhood of Locomotive Firemen & Eng'rs*, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22 (1949) (union's duty under RLA, as the exclusive bargaining representative, to provide nondiscriminatory representation); *Virginian Ry. v. System Federation No. 40*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937) (employer's duty under RLA to recognize and negotiate with the duly accredited labor representative).

The preliminary injunction granted below cannot be sustained on the rationale of any of these existing exceptions to the Act. Camping concedes as much, but asserts that we should make a new accommodation, one it considers similar. This argument is based not on the necessity of accommodating the 1934 legislation to the policies reflected in some newer federal statute, but rather on the employer's view of the policy behind the Norris–LaGuardia Act itself. According to Camping:

> The Norris LaGuardia Act was enacted in response to the use of injunctions as a weapon against employee concerted activity. (Section 2, 29 U.S.C. § 102). Historically, injunctions prohibiting such concerted activity often had the effect of tipping the balance in favor of one or the other of the parties to a labor dispute, since strikes and other concerted activity were time-sensitive.... In this case, the underlying policy behind the Norris LaGuardia Act is not called into play, since concerted activity is not involved.

Thus, Camping would apparently have us hold that the Act protects only strikes, or other disruptive group conduct. The employer cites no authority for this policy

analysis, and we find no support for it in federal labor law. In fact, a host of considerations militate against Camping's proposal that the Norris–LaGuardia Act be limited in any such way.

First, limiting the Act to disruptive group conduct, or indeed any group conduct, would render much of the Act's language and structure superfluous, if not incomprehensible. "Ceasing or refusing to perform any work or to remain in any relation of employment" is only one of the many acts specifically protected against any and all injunctions under section 4. Others include, for example, joining a union, joining an employer organization, publicizing the existence of a labor dispute, and assembling peaceably to assert collective interests. 29 U.S.C. § 104. Thus, even the specific statutory prohibitions are far broader than Camping would permit. Given that Congress did not stop with section 4, but rather added a number of other sections dealing with injunctions against acts that are *not* specifically mentioned in section 4, we cannot possibly construe these less exacting provisions to apply to even fewer situations than those specifically mentioned in that section.

Second, decisions from both the Supreme Court and the courts of appeals clearly contradict the proposed limitation. For instance, a number of *early decisions in which the Supreme Court did allow injunctions against activities other than strikes* were based not on Camping's rationale, but rather on the ground that the injunction merely enforced a more recent federal labor statute. *See, e.g., Lincoln Mills*, 353 U.S. at 457–59, 77 S.Ct. at 918–19; *Graham*, 338 U.S. at 237–40, 70 S.Ct. at 17–18; *Virginian Railway*, 300 U.S. at 562–63, 57 S.Ct. at 606. Certainly the limitation proposed by Camping would have provided a much tidier rationale for those cases if it were sound; the Court's more circuitous route to the result leads us to believe it is not. In addition, other courts of appeals have unhesitatingly applied the Act to forbid injunctions against acts other than concerted activity by a union. It is well settled, for example, that, as the Act explicitly

provides, it applies in appropriate circumstances when injunctions are sought against employers. *See generally* H. Perritt, *Labor Injunctions* 169–204 (1986 & 1990 Supp.), and cases cited therein.

Third, there is something strange in the suggestion that a federal labor statute should be applied so as to protect the right to strike but not the right to arbitrate. Modern labor law is largely dedicated to attempting to reduce the need for strikes and other disruptions of social and economic stability caused by labor unrest, and to encourage the use of methods of dispute resolution more conducive to harmonious relations between labor and management —namely, collective bargaining and arbitration. "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement...." 29 U.S.C. § 173(d); *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 377, 94 S.Ct. 629, 636, 38 L.Ed.2d 583 (1974); *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 566, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). This method is not only the most likely to succeed, but may also be the most therapeutic for the parties to the dispute. 363 U.S. at 568, 568 n. 6, 80 S.Ct. at 1346, 1347 n. 6.

Arbitration is designed to settle labor disputes quickly, as they arise; much of its value is lost if it is stayed by a federal court. Congress has quite recently recognized this outside the labor context in enacting an amendment to the Federal Arbitration Act, 9 U.S.C. §§ 1–15. Section 15 now provides generally for interlocutory appeals from orders "impeding the expeditious disposition of an arbitration," 9 U.S.C.A. § 15 ("Practice Commentary"), but not from orders compelling arbitration, directing arbitration to proceed, refusing to enjoin an arbitration, or staying a judicial proceeding pending an arbitrator's resolution of an arbitrable issue. Given the special importance attached to arbitration in the labor field, we believe delay occasioned by judicial interference is even less to be countenanced in that area. Indeed, even

Camping must concede that our national labor policy is hostile to the three-year delay thus far occasioned by the district court's orders in this case.

Fourth, the Norris–LaGuardia Act embodies this aspect of national labor policy particularly plainly, by attaching special importance to the availability of arbitration as a way of resolving a labor dispute. As the Supreme Court stated in *Lincoln Mills,* "Section 8 of the Norris–LaGuardia Act does, indeed, indicate a congressional policy toward settlement of labor disputes by arbitration, for it *denies injunctive relief* to any person who has failed to make 'every reasonable effort' to settle the dispute by negotiation, mediation, or 'voluntary arbitration.'" 353 U.S. at 458, 77 S.Ct. at 918 (emphasis added). Hence the exception urged by Camping would not only be contrary to labor policy in general; it would be directly antithetical to the express policies underlying the Act.

Our analysis of the purposes underlying the Act is fortified by a consideration of the cases in which the Supreme Court *has* created an exception to the literal strictures of the Norris–LaGuardia Act. Every such case we have discovered accommodates the Act either to a duty specifically imposed by another statute, or to the strong federal policy favoring labor arbitration. *See, e.g., Boys Markets,* 398 U.S. at 249–53, 90 S.Ct. at 1587–88; *Lincoln Mills,* 353 U.S. at 457–59, 77 S.Ct. at 918–19; *Chicago River,* 353 U.S. at 40–42, 77 S.Ct. at 640–41; *Graham,* 338 U.S. at 237–40, 70 S.Ct. at 17–18; *Virginian Railway,* 300 U.S. at 562–63, 57 S.Ct. at 606. The Supreme Court has in recent years stated this generalization in such a way as to suggest that exceptions to Norris–LaGuardia are limited by this principle. *See Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n,* —— U.S. ——, 109 S.Ct. 2584, 2598, 105 L.Ed.2d 415 (1989); *Jacksonville Bulk Terminals,* 457 U.S. at 717 n. 17, 102 S.Ct. at 2682 n. 17.

The pro-arbitration stance of the accommodation doctrine is well illustrated by *Boys Markets* and the subsequent refinement of that case in *Buffalo Forge.* In

*Boys Markets,* the Supreme Court held that notwithstanding section 4 of the Norris–LaGuardia Act, a federal court could enforce the "no strike" provision of a collective-bargaining agreement by enjoining strikes in violation of the agreement and compelling arbitration. Later, in *Buffalo Forge,* the Court explained,

> The driving force behind *Boys Markets* was to implement the strong congressional preference for the private dispute settlement mechanisms agreed upon by the parties. Only to that extent was it held necessary to accommodate § 4 of the Norris–LaGuardia Act to § 301 of the Labor Management Relations Act and to lift the former's ban against the issuance of injunctions in labor disputes. Striking over an arbitrable dispute would interfere with and frustrate the arbitral processes by which the parties had chosen to settle a dispute.

*Buffalo Forge,* 428 U.S. at 407, 96 S.Ct. at 3147. The *Boys Markets* exception to Norris–LaGuardia was so completely grounded upon the strong federal policy in favor of labor arbitration that in *Buffalo Forge* the Court limited the exception to strikes over *arbitrable* disputes. Hence, when a union is merely striking, rather than striking *over something it should be arbitrating,* the Norris–LaGuardia Act applies with full force. 428 U.S. at 407–11, 96 S.Ct. at 3147–49.

Against the background these cases provide, it is quite apparent that the exception urged on us by Camping is not merely *outside* the prior accommodation cases, but rather *contrary* to them. While prior cases have allowed equitable relief to enforce agreements to arbitrate, Camping sought and procured an order *precluding* arbitration, thereby offending the spirit and purpose of Norris–LaGuardia as well as its literal terms. The case is in this respect quite similar to *In re District No. 1,* in which the District of Columbia Circuit vacated a preliminary injunction staying a labor arbitration. That court recognized that federal labor policy, as specifically manifested in prior decisions under the Norris–LaGuardia Act, takes contractually agreed-upon arbitration to be the preferred solution to labor disputes, not a part of the problem. 723 F.2d at 77. As the court said there, "The least that *Lincoln Mills, American Manufacturing* and *Warrior & Gulf* require is that the parties to a collective bargaining agreement be allowed—indeed, required—to use their contractual grievance-arbitration procedure without intervention by a court." *Id.* at 78. The court then vacated the district court's stay on the ground that the district court failed to comply with the requirements of the Norris–LaGuardia Act. *Id.* at 79.

In denying a petition for rehearing in *In re District No. 1,* the court again drew attention to the public policy declared in the Act:

> It would be utterly ironic and ridiculous for us to hold, in the face of the explicit jurisdictional and public policy provisions of § 1, the specific requirement in § 8 compelling resort to arbitration as a prerequisite to any injunctive relief, and the undisputed fact that this case arises out of a labor dispute, that an injunction should nevertheless issue because injunctions against arbitration are not listed in § 4. Such a conclusion would effectively destroy substantial and important provisions of the Norris–LaGuardia Act.

723 F.2d at 81. It should be plain from our discussion thus far that we agree with the D.C. Circuit's assessment of the important public policies at stake here, as well as with its conclusion that Norris–LaGuardia applies to stays of labor arbitration proceedings.

■ Camping seeks to distinguish *In re District No. 1* on the ground that in our case there is a dispute over the existence of a collective-bargaining agreement rather than merely over the meaning of the provisions of an acknowledged contract. Camping apparently believes that Norris–LaGuardia applies only if it is clear that an agreement to arbitrate is actually in effect. We disagree. Even if the arbitrability of the grievances involved in *In re District No. 1* had been as free from doubt as Camping asserts, the D.C. Circuit's reasoning could not be distinguished on that

ground. The Norris–LaGuardia Act is made applicable by virtue of the existence of a *labor dispute,* not the existence of an arbitrable dispute or, indeed, even of a collective-bargaining agreement. Perhaps the central application of the Act during its early years was to protect strikes called in order to pressure employers to enter into collective bargaining with a union. The Act would scarcely have been such a milestone in the development of federal labor law if it had applied only where a collective-bargaining agreement already existed. Camping's suggestion that the Act does not apply when the existence of the collective-bargaining agreement is in doubt is simply indefensible in light of the fact that, historically, one of the principal purposes of the Act was to preclude injunctions where there was *clearly* no collective-bargaining agreement at all.

Alternatively, if Camping's argument is based on a theory regarding uncertainty as to the existence of an agreement to arbitrate rather than uncertainty as to the existence of a collective-bargaining agreement (and as a practical matter, the two are in many cases identical), it is no more persuasive. The fact that the dispute is over the existence or enforceability of an obligation to arbitrate (*i.e.,* arbitrability) makes it no less a dispute—and when an employer and a union are involved, no less a labor dispute. In short, we believe the D.C. Circuit's reasoning is just as compelling when the parties are engaged in a dispute over arbitrability as when the obligation to arbitrate is clear. Thus, we hold that the rule of *In re District No. 1* is fully applicable here as well as in the circumstances to which Camping would limit it.

In the end, we find that many distinct lines of reasoning lead us toward the conclusion that the district court was required to comply with the Norris–LaGuardia Act. No existing exception to the Act covers the case before us, and the new exception suggested by Camping is foreclosed not only by the language and purpose of the Act, but also by the holdings and rationales of many prior appellate decisions.

## C

The only countervailing consideration that gives us any pause is the possibility that the order issued below could be justified as an injunction necessary to preserve the court's jurisdiction. According to this argument, a court presented with a question of arbitrability should be able to stay arbitration long enough to decide whether the matter is arbitrable. This theory has some appeal, but we reject it, for three reasons. First, this is not a case where one statute fails to provide jurisdiction but jurisdiction is nonetheless present on some other ground. *Cf. Sheehan v. Purolator Courier Corp.,* 676 F.2d 877, 881 (2d Cir.1981) (Title VII does not vest a federal court with jurisdiction to grant private plaintiffs' request for preliminary injunctive relief, but the court's inherent equity power does provide jurisdiction to do so). This is instead a case where a statute *divests* the court of jurisdiction to do a particular act, regardless of what the jurisdictional basis of the act would otherwise have been. Once a court is made aware that the controversy before it "involv[es] or grow[s] out of a labor dispute," it has no jurisdiction to issue injunctive relief except in conformity with the Norris–LaGuardia Act. Thus, although the "preservation of jurisdiction" rationale *might* support a stay imposed in order to permit the court to decide *whether the Norris–LaGuardia Act is applicable, cf. United States v. United Mine Workers,* 330 U.S. 258, 289–93, 67 S.Ct. 677, 693–96, 91 L.Ed. 884 (1947) (holding the Act inapplicable to the United States in its role as employer), it cannot support a stay pending a determination *whether a particular dispute is arbitrable.* The question of arbitrability has no bearing on whether or not the court is dealing with a labor dispute; and once it is clear that a labor dispute is involved, the court has no jurisdiction to grant any injunction except in compliance with the Norris–LaGuardia Act.

Second, the question is not really one of *preserving* federal jurisdiction; it is rather one of determining *when it should be exercised.* Arbitration awards are not self-enforcing; and unless an award persuades

the party contesting the arbitrator's authority to comply voluntarily with its terms, it will have no binding effect on either party until it is confirmed in court. The reluctant party to the arbitration therefore retains its right to a judicial determination of the arbitrator's jurisdiction; it will simply come after the arbitration rather than before. In light of the rule that courts must resolve any doubts about the arbitrator's jurisdiction in favor of arbitrability, *Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1352–53, we believe it will be the exception rather than the rule that an arbitrator will assert jurisdiction over a dispute in which a court could have said before the arbitration "with *positive assurance* that the arbitration clause is *not susceptible of* an interpretation that covers the asserted dispute." *Id.* at 582–83, 80 S.Ct. at 1353 (emphasis added). In any event, a careful party in Camping's position, by preserving the arbitrability issue, will have the opportunity to have the court correct any such occasional error expeditiously. Certainly we find this procedure fairer and more efficient than requiring the party asserting arbitrability to go to federal court *twice:* once before the arbitration, on the issue of arbitrability, and once afterward, on the substantive issues raised by way of motions to enforce or vacate the arbitrator's award. We also, not incidentally, find it to be more consistent with Congress's approach to appealability under the Federal Arbitration Act, which clearly evidences a preference for erring in favor of arbitration and deferring the exercise of federal jurisdiction. *See* 9 U.S.C. § 15, discussed *supra.*

Finally, we note that the exercise of federal jurisdiction is subject to specific statutory limitations in this case, just as it is in any other. Thus, we do not hold that arbi-

trations of labor disputes may never be stayed or enjoined by federal courts; that issue is not before us. We decide only that Norris–LaGuardia is applicable to requests for such relief. In the case before us, the parties properly observe that arbitration is not one of the activities covered by section 4 of the Act. Hence the Act does not, on its face, completely prohibit courts from enjoining labor arbitration proceedings. It is only fair to add, however, that other restrictions in the Act that are applicable to conduct not covered by section 4 are in effect almost as prohibitive when applied to attempts to enjoin labor arbitrations. Those restrictions are found in sections 7 and 8. If judicial interference with a labor arbitration hearing is *ever* permissible under Norris–LaGuardia, the necessity of meeting the requirements of those sections will make such intervention a rare occurrence indeed.[9] Yet we do not find this prospect to be a sound argument for refusing to apply the statute as it is plainly written. To the contrary, we believe the general unavailability of injunctions against labor arbitrations properly reflects the fact that parties reluctant to arbitrate are not, as a general rule, unduly prejudiced by the deferral of federal jurisdiction. See Part III.D, *infra.*

In summary, we conclude that the court's general power to preserve its own jurisdiction cannot support the stay of arbitration granted below. Norris–LaGuardia conditions and delays the exercise of jurisdiction, but certainly does not destroy it; to the extent the court may be required to postpone the exercise of its jurisdiction, it will be due to Congress's explicit statement of its intention to restrict federal injunctive relief in cases involving labor disputes. The "preservation of jurisdiction" rationale thus provides no good reason for us to

---

9. It is difficult to imagine, for example, how the commencement of a labor arbitration could constitute an "unlawful act" for the purposes of section 7(a). Assuming that the federal courts are "the public officers charged with the duty to protect [the] property [of the party resisting arbitration]," it would also appear to be difficult to satisfy section 7(e)'s requirement that the courts are "unable or unwilling to furnish such protection." It is equally difficult to imagine how a party seeking to enjoin an arbitration could show attempts at nonjudicial dispute resolution that would satisfy section 8. All of this is aside, of course, from the procedural requirements of section 9. We need not attempt to forecast how any of these requirements, or others imposed by the Act, will be interpreted in the future; we merely note the unlikelihood that all will be met in any given case.

suspend the Act's requirements—and certainly not when the practical effect of doing so would be to encourage the issuance of injunctions designed to interfere with the orderly resolution of labor disputes.

## D

■ Camping objects that application of the Norris–LaGuardia Act will force it to arbitrate disputes that may not be arbitrable, and that it will suffer irreparable injury as a result. Judge Legge apparently agreed, finding "a substantial likelihood that [Camping] would suffer irreparable harm if the arbitration were to proceed.... In addition, the balance of the hardship, should the arbitration proceed absent a stay, would tip towards [Camping]." Even aside from its failure to apply Norris–LaGuardia, the court was clearly in error. We note these errors because they are relevant to the analysis the district court will be required to make under section 7 of the Act if it again considers issuing an injunction on remand.

The district court's principal error lies in its assumption that unnecessarily undergoing arbitration proceedings constitutes irreparable injury. That is simply not the case. First, the party objecting to arbitration might well suffer no harm at all, irreparable or otherwise, for the arbitration panel might decide in its favor. Here, for example, Camping could prevail either on the termination issue or on the merits of the underlying grievances. A party which prevails at an arbitration to which it objects would probably save time and money by having the matter resolved in its favor in arbitration rather than in litigation. Second, even if the other party obtains a favorable award from the arbitrator, that award, as we noted in Part III.C *supra*, is not self-enforcing. Arbitration of disagreements arising under a collective-bargaining agreement is regarded as a continuation of the collective-bargaining process; an award, prior to judicial enforcement, is treated as simply a part of the contract. Thus, it has no more effect than any provision of a collective-bargaining agreement normally has; it cannot by itself inflict

anything like irreparable injury. Third, any arbitral award obtained by the party seeking arbitration will have no preclusive effect in a subsequent confirmation or *vacatur* proceeding as long as the objecting party has reserved its right to a judicial, rather than arbitral, determination of arbitrability. The law thus leaves parties like Camping with a perfectly adequate legal remedy for an improper award; the only remaining harm—the short time and slight expense involved in the typical arbitration—would scarcely qualify as irreparable injury. Nor can we say that the minor expense and inconvenience to the objecting party, including being the object of an outstanding unfavorable award, outweighs the other party's interests, of which the district court seems to have taken little notice in this case. We have pointed out above that a labor arbitration is likely to have therapeutic value even for the losing party or parties; this will only be true, however, if the arbitration takes place within a reasonable time after the grievance is filed. There are other, equally important reasons why speedy arbitration hearings are necessary—rapid turnover of the work force being one. Here, the lengthy delay caused by the preliminary injunction granted below represents near-total vitiation of the salutary effect which the typically quick and inexpensive arbitration is presumed to have on labor-management relations.

## E

Camping's final argument is that we have previously approved of the concept of injunctive relief in cases like this, citing *George Day Constr. Co., Inc. v. United Bhd. of Carpenters & Joiners, Local 354*, 722 F.2d 1471 (9th Cir.1984). In *George Day* we refused to vacate an arbitration award that was based in part on the arbitrator's determination of his own jurisdiction. We held that the employer waived its right to a judicial determination of arbitrability by voluntarily submitting that question to the arbitrator. *Id.* at 1475–76. In response to the employer's contention that it had been virtually forced to submit the

arbitrability question to the arbitrator in order to avoid default, we observed that "the employer could have taken the initiative by seeking declaratory and injunctive relief prior to the commencement of arbitration." *Id.* at 1476.

 This was of course an *obiter dictum*, and we would be justified in departing from it if we thought we were required to do so, since the *George Day* court did not consider the Norris–LaGuardia Act. However, our decision in the instant case is not inconsistent with our remark in *George Day*. Even under today's decision, the employer may still seek declaratory and injunctive relief prior to the commencement of arbitration. If an employer were to obtain a judicial declaration of repudiation prior to the commencement of arbitration, then that declaration would be binding on the arbitrator in any later proceeding, if indeed the union were to proceed at all. And although we cannot imagine that an employer armed with a judicial declaration of repudiation would find it necessary to pursue a request for an injunction against an arbitration hearing that could not lead to an enforceable award, our decision does not preclude the making of such a request. Today, we hold only that the Norris–LaGuardia Act is applicable to orders enjoining labor arbitrations. Notwithstanding the serious doubts we have expressed regarding the ability of a party seeking such an order to meet all of the requirements of sections 7 and 8 of the Act, we do not here foreclose future litigants from advancing the argument that under extraordinary circumstances those conditions can all be met.

Finally, we note that here, as in *George Day*, the employer is the architect of its own predicament. Camping was not under any legal obligation to agree to a grievance procedure according to which it was possible for an arbitration to go forward without either its consent or a court order. If it had not done so, the unions would have been forced to seek an order compelling arbitration under section 301, and the district court could have decided to defer its decision on the arbitrability question until after it had resolved the repudiation issue.

Moreover, even under the existing agreement, Camping cannot be deprived of its right to a judicial determination of arbitrability, as we have previously noted. Here, as in *George Day*,

> the employer could have avoided the problem by simply [participating in the arbitration without] giving the arbitrability question to the arbitrator for decision. The employer merely had to voice its objection on the arbitrability issue and state on the record that it was reserving that question for later judicial determination. In this way, the question could be preserved for an independent judicial scrutiny at any subsequent proceeding for vacatur or enforcement.

*Id.* at 1476.

### F

We conclude, for all of the reasons stated above, that the instant case "involv[es] or grow[s] out of a labor dispute," and is therefore subject to the provisions of the Norris–LaGuardia Act. No established exception excused the district court from complying with the requirements of that Act, and no new exception is warranted in the situation before us.

Because the district court made no attempt to comply with the Act, it is hardly surprising that its order fails to satisfy any of the various conditions set down by Congress. Since the court had no jurisdiction to enter a preliminary injunction except in compliance with the provisions of the Act, the injunction was issued unlawfully.

### CONCLUSION

The district court correctly concluded that it was for a board of adjustment to determine whether the District Council's letter of February 21, 1980, effected a valid termination of Camping's contractual obligations under the 1977–1980 Master Agreement, and we affirm this portion of its order. However, the court erred in holding that the issue of repudiation was also arbitrable. We reverse summary judgment for the unions on that issue and remand to the district court to determine whether, prior to February 20, 1987, Camping effectively

repudiated its prehire agreement under pre-*Deklewa* law. Finally, we hold that the Norris–LaGuardia Act is applicable to Camping's request for a preliminary injunction. Because the district court failed to apply the various provisions of the Act, the issuance of the injunction was in excess of the court's jurisdiction.

AFFIRMED in part and REVERSED in part.